LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
– and –
WILLIAM S. LERACH (68581)
DARREN J. ROBBINS (168593)
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
PAUL J. GELLER
JONATHAN M. STEIN
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiff

04 AUG -3 PM 3:00
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JERRELL JOHNSON, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

vs.

THORATEC CORPORATION, D. KEITH GROSSMAN and M. WAYNE BOYLSTON,

Defendants.

No. C 04 3168 RMW RS

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

**SUMMARY AND OVERVIEW**

1. This is a securities class action on behalf of all purchasers of the publicly traded securities of Thoratec Corporation ("Thoratec" or the "Company") between April 28, 2004 and June 29, 2004 (the "Class Period"), against Thoratec and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2. Thoratec is the leading supplier of implantable heart pumps and left ventricular assist devices ("LVADs"). The Company manufactures these circulatory support products for use by patients with congestive heart failure, including "end-stage" patients. Traditionally these products have been used in such patients as a "bridge to transplant," for patients awaiting a heart transplant. The fact that only 2,120 donor hearts were available for transplantation in 2003 underscores the fact that only a limited number of units are need to service this market.

3. In contrast, "Destination Therapy," or permanent support, is the Company's flagship new treatment option for patients with end-stage heart failure. Unlike the "bridge-to-transplant" market, a far greater patient population is possible, since the decision to implant such a device no longer requires that a patient be in need or otherwise eligible for heart transplant.

4. The Company claims that its HeartMate XVE LVAS ("HeartMate") is an approved ventricular assist device designed to provide permanent support for these patients. The Company claims not only that the HeartMate has been approved as a bridge to cardiac transplantation since 1994, used in more than 4,000 patients worldwide, but also that, through Destination Therapy, the HeartMate offers a breakthrough treatment option for end-stage heart failure ("ESHF") patients.

5. During the Class Period, defendants made a number of false and misleading statements regarding expected sales and the market for the HeartMate as a "Destination Therapy" treatment for ESHF patients.

6. As a result of these statements, Thoratec's stock traded at artificially inflated levels and defendants were able to complete a $143.7 million note offering. Then, on June 29, 2004, after the market closed, Thoratec released its preliminary results for the quarter ended June 30, 2004. These results were much worse then previous forecasts. On June 30, 2004, the price of Thoratec

stock dropped precipitously to $10.74 from a close of $14.42 the prior day, a drop of more than 25%, on extraordinarily heavy volume of over 11 million shares.

7. The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a) Even as the Company estimated that as many as 100,000 patients per year in the U.S. could be helped by their new Destination Therapy treatment option, the actual "true" market for the product was far less than claimed, as it was severely constrained by limited reimbursement dollars available under Medicare and Medicaid service guidelines.

(b) Although the defendants claimed that there were approximately 900 hospital centers in the U.S. qualified for the practice of Destination Therapy and implantation of the HeartMate XVE LVAS, in fact less than 75 centers have been designated as Medicare-approved for Destination Therapy.

(c) While the Company pointed to its "sample letter of medical necessity," along with instructions on how to "educate the payer" on costs associated with the treatment option posted on its Web site, defendants already knew that Medicare had rigid preset reimbursement guidelines and schedules for Destination Therapy – guidelines and schedules that could only translate into a serious negative impact on the Company's FY 2004 sales projections for the HeartMate.

(d) Cardiothorasic surgeons were rejecting and/or not accepting the HeartMate as a viable device for Destination Therapy patients because of issues with the device's reliability in a long-term setting.

(e) The demand for the Company's Destination Therapy implants was not growing at the rate claimed.

(f) The Company's Destination Therapy implant estimate for FY2004 of between 300 to 500 pumps was grossly overstated and was internally projected to be a fraction of this estimate.

(g) The Company's FY2004 projections of $190-$200 million was overstated by tens of millions of dollars.

(h) Not only were CMS reimbursement charges delaying the number of implants, the Company was aware that implantation centers and medical professionals had delayed any significant expansion of the existing implant programs until after October 1, 2004, the expected date of the availability of a significant increase in the CMS reimbursement rate.

(i) Sales of the HeartMate implants would be depressed until Q4 2004 and as a result, the Company's earnings shortfall experienced in Q1 2004 (versus Q4 2003 and Q1 2003) would not be made up for nearly one year, until Q1 2005, at best.

8. As a result of the defendants' false statements, Thoratec's stock price traded at inflated levels during the Class Period, increasing to $14.55 on May 24, 2004 and $14.84 on June 8, 2004, whereby the Company's top officers and directors sold more than $143.7 million worth of corporate notes.

**JURISDICTION AND VENUE**

9. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

10. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

11. The Company's principal executive offices are in Pleasanton, California, where the day-to-day operations of the Company are directed and managed.

**THE PARTIES**

12. Plaintiff Jerrell Johnson purchased Thoratec publicly traded securities as described in the attached certification and was damaged thereby.

13. Defendant Thoratec manufactures circulatory support products for use by patients with congestive heart failure.

14. Defendant D. Keith Grossman ("Grossman") was the President and CEO of Thoratec. During the Class Period, Grossman assisted in the sale of more than $143.7 million worth of the corporate notes.

15. Defendant M. Wayne Boylston ("Boylston") was the CFO of Thoratec. During the Class Period, Boylston assisted Grossman in the sale of more than $143.7 million worth of corporate notes.

16. The individuals named as defendants in ¶¶14-15 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Thoratec's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶26, 29-31, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**SCIENTER**

17. In addition to the above-described involvement, each Individual Defendant had knowledge of Thoratec's problems and was motivated to conceal such problems. Boylston, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing Thoratec's forecasted and actual growth were prepared by the finance department under Boylston's direction. Defendant Grossman, as CEO and President, was responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

18. Defendants were motivated to engage in the fraudulent practices alleged herein in order to obtain financing for the Company via its $143.7 million note offering.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

19. Each defendant is liable for (i) making false statements, ***or*** (ii) failing to disclose adverse facts known to him about Thoratec. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Thoratec publicly traded securities was a success, as it (i) deceived the investing public regarding Thoratec's prospects and business; (ii) artificially inflated the prices of Thoratec's publicly traded securities; (iii) allowed defendants to obtain larger bonuses which were directly tied to the performance of Thoratec shares; (iv) allowed defendants to arrange to sell and actually sell in excess of $143.7 million worth of Thoratec notes at artificially inflated prices; and (v) caused plaintiff and other members of the Class to purchase Thoratec publicly traded securities at inflated prices.

**BACKGROUND**

20. Thoratec claims to be the leading supplier of implantable heart pumps and LVADs. The Company manufactures these circulatory support products for use by patients with congestive heart failure, including "end-stage" patients. Traditionally these products have been used in such patients as a "bridge to transplant," for patients awaiting a heart transplant. The fact that only 2,120 donor hearts were available for transplantation in 2003 underscores the fact that only a limited number of units are need to service this market.

21. In contrast, Destination Therapy, or permanent support, is the Company's flagship new treatment option for patients with end-stage heart failure. Unlike the "bridge-to-transplant" market, a far greater patient population is possible, since the decision to implant such a device no longer requires that a patient be in need or otherwise eligible for heart transplant.

22. The Company claims that its HeartMate product is an approved ventricular assist device designed to provide permanent support for these patients. The Company claims not only that the HeartMate has been approved as a bridge to cardiac transplantation since 1994, used in more than 4,000 patients worldwide, but also that, through Destination Therapy, the HeartMate offers a breakthrough treatment option for ESHF patients.

23. Defendants claimed that a significant increase in reimbursement for Medicare patients would be an important development that would facilitate successful commercialization of this

opportunity. While Medicare patients would represent a majority of Destination Therapy patients, a meaningful percentage of the patients were claimed to be covered by private insurance, and reimbursed at an even higher rate.

24. Thoratec has also represented that there are numerous improvements in the HeartMate, including the recently incorporated improvement in the design of the inflow valve housing, coupled with the substantial improvements in patient care protocols. Thoratec also represented it had made significant efforts to reduce device-related morbidity and therefore hospital costs.

25. The Company also told the market that it enjoyed a monopoly position with respect to the Destination Therapy opportunity, which afforded it the luxury of time to penetrate the market while bringing all the other components necessary to commercialize this opportunity up to "more optimal levels." The HeartMate was to remain the only FDA approved device for Destination Therapy for a minimum of four more years. Thus, investors reasonably expected Thoratec's favorable results would continue.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

26. On April 27, 2004, after the market closed, the Company issued a press release entitled "Thoratec Reports Record First Quarter Sales." The press release stated in part:

> Thoratec Corporation a world leader in products to treat cardiovascular disease, today reported results for the first quarter ended April 3, 2004.
>
> The company said product sales for the period were a record $42.8 million, a 19 percent increase over sales of $36.1 million in the first quarter a year ago.
>
> Taxed cash earnings, which exclude the effect of legal settlement, merger, restructuring and other costs and amortization of purchased intangible assets, were $3.2 million, or $0.06 per share, versus taxed cash earnings of $3.3 million, or $0.06 per share, in the same period a year ago.
>
> On a GAAP basis, Thoratec reported net income in the first quarter of fiscal 2004 of $1.3 million, or $0.02 per share, versus net income of $1.4 million, or $0.03 per share, in the same period a year ago.
>
> "Our results for the quarter reflect solid growth in both our Cardiovascular and ITC divisions," noted D. Keith Grossman, president and chief executive officer of Thoratec.

"Sales of our heart assist devices benefited from this being the first full quarter in which we had Destination Therapy approval and the National Coverage Decision from Medicare, as sales of our HeartMarte (R) device grew by 26 percent. We feel we are off to a very good start with this new indication for use, as 42 Destination Therapy implants took place in the quarter.

"The overall patient experience and outcomes with Destination Therapy patients to date have been very positive and the centers are reporting a decreasing number of adverse events. Many of these patients have been implanted with our HeartMate (R) XVE that incorporates the new inflow valve conduit and the clinician response to this product enhancement has been very favorable to date. In addition, we currently have 67 centers approved by the Centers for Medicare and Medicaid Services (CMS) for Destination Therapy reimbursement by Medicare.

"At ITC," he continued, "revenues grew 34 percent versus the first quarter a year ago, as its offerings continued to achieve market share gains. Revenues from ItC's alternate site testing products increased 60 percent versus a year ago, and its point-of-care coagulation testing devices also experienced strong sales growth. We also recorded sales from the IRMA(R) TRUpoint product line, which we acquired last year. Even without the IRMA TRUpoint revenues, ITC sales would have increased nearly 20 percent versus a year ago."

Jeffrey Nelson, president of the company's cardiovascular division, noted that operating expenses in the quarter reflect costs associated with the ramp up of sales and marketing programs to support Destination Therapy, such as the Heart Hope (TM) intitiative.

"This effort, which is a collaboration between Thoratec and leading heart centers committed to advancing clinical, educational and economic outcomes of Destination Therapy, is just beginning to have an impact in the marketplace," Nelson noted.

"Approximately 20 leading centers have signed up for the Heart Hope program and several more have indicated they will be doing so. We believe that between 25 and 30 centers may accept our invitation to commit to the program this year. We are very pleased with the response to Heart Hope to date. In fact, approximately 70 percent of the 42 Destination Therapy procedures during the quarter were done at our targeted Heart Hope centers," he added.

Nelson noted that a key element of Heart Hope is the development of HeartMate Destination Therapy Advanced Practice Guidelines and that these were presented at the first Heart Hope Users Conference last week. The meeting was attended by some 50 clinicians, including cardiac surgeons, heart failure cardiologists and VAD coordinators.

"The response from attendees, who are thought leaders, was very positive and they came away with even a higher level of enthusiasm for the Destination Therapy opportunity. They felt that these new practice guidelines were right on target with respect to the important issues facing development of the market-particularly those guidelines related to nutrition management-which are among the first of its kind for heart failure patients," he noted.

The company also said that it has now implanted four patients in the U.S. HeartMate II clinical trial, and they are doing well. The initial two patients have now been supported by the device for nearly six and four months, respectively. Two

patients have been implanted in the European trial for the device, although both passed away for reasons unrelated to the device.

The company also announced that it received home discharge approval for patients in the U.S. HeartMate II trial, and approval to resume its clinical trial for the device in the United Kingdom. In addition, the company has filed a submission with the FDA to expand the current Phase I U.S. trial from four to ten centers and seven to 15 patients.

"The home discharge approval is significant, because we believe this will facilitate the pace of enrollment in the trial as recovery at home is a plus for both the patient and hospital, and we are hopeful that the FDA will approve our request for an expanded trial within the next three weeks. We are also delighted to be underway again in the United Kingdom and would anticipate that we might have our first patient enrolled there by later this quarter," Nelson said.

The HeartMate II is the company's next generation design heart assist device intended for long-term cardiac support for patients who are in end- stage heart failure. It is an implantable LVAS (left ventricular assist system) powered by a rotary pump. It weighs approximately 12 ounces, making it significantly smaller than currently approved devices. The initial U.S. safety and efficacy trial involves seven patients at four centers and the device is being evaluated initially for bridge-to-transplantation. The company hopes to use the data from this initial trial for approval of an expanded trial that will also study use of the device for Destination Therapy.

The company also reiterated its financial guidance for fiscal 2004, including revenues of $190-$200 million, cash earnings of $30-$35 million, or $0.53-$0.61 per share, or taxed cash earnings of $0.32-$0.38 per share.

27. Defendants' statements were false and misleading for a number of reasons. First, defendants knew that, despite the fact that Medicare had already agreed to reimbursement for the use of the HeartMate in Destination Therapy, major impediments to sales continued to exist, such that it would be impossible to grow the product at anticipated rates. In fact, defendants knew of at least four structural impediments to the expansion of the HeartMate market for use in Destination Therapy, specifically: (i) CMS-dictated reimbursement rates did not provide sufficient financial incentives to implantation centers, cardiologists and surgeons; (ii) medical care professionals were concerned about Destination Therapy generally, such that they remained psychologically unready to use the device as a treatment option; (iii) the Company had just made major additional functional changes to the product, such as an attempt to improve the design of the inflow valve housing; and (iv) critically important mortality data, such as the two-year mortality rate, was simply not yet available.

28. The market reacted very favorably to defendants' statements and Thoratec's stock price increased from $11.96 on April 27, 2004 to $13.20 per share on April 28, 2004. By mid May 2004, the stock traded at nearly $15.00 per share.

29. On May 17, 2004, the Company issued a press release entitled "Thoratec Announces Intention to Offer $125 Million Senior Subordinated Notes." The press release stated in part:

> Thoratec Corporation today announced its intention to commence an offering, subject to market conditions, of senior subordinated convertible notes due 2034 with gross proceeds to the company of $125 million to be offered and sold to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended. The interest rate, number of shares issuable upon conversion of the notes, investor put rights and company redemption rights are to be determined by negotiations between the company and the initial purchaser of the notes.
>
> Thoratec expects to grant the initial purchaser a 30-day option to purchase up to an additional 15% of principal amount of senior subordinated convertible notes. Thoratec intends to use a portion of the net proceeds to acquire U.S. government securities that will be pledged as collateral for the payment of the first six scheduled interest payments on the notes and to purchase up to $60 million of shares of its common stock in connection with the offering pursuant to the company's stock repurchase program. Thoratec intends to use the balance of the net proceeds from the offering for general corporate purposes, which may include additional stock repurchases, strategic investments or acquisitions. Pending such uses, Thoratec intends to invest the net proceeds in interest bearing, marketable securities.

30. On May 19, 2004, the Company issued a press release entitled "Thoratec Announces Pricing of Offering of $125 Million Senior Subordinated Convertible Notes." The press release stated in part:

> Thoratec Corporation today announced the pricing of its offering of senior subordinated convertible notes due 2034 with gross proceeds to the company of $125 million through an offering in the United States to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended. The issuance of notes is expected to close on May 24, 2004.
>
> The notes will be convertible, under certain circumstances, into Thoratec common stock at an initial conversion rate of 29.4652 shares per note (or an initial conversion price of approximately $19.72 per share), subject to adjustment upon the occurrence of certain events. The initial conversion price represents a 37.5 percent premium over the closing sale price of Thoratec common stock on May 18, 2004, which was $14.34 per share. The notes will bear cash interest at a rate of 2.375 percent per annum until May 16, 2011. After that date, original issue discount will accrue daily at a rate of 2.375% per year on a semiannual bond equivalent basis and on the maturity date, a holder will receive $1,000 per note. The notes will be issued at a price of $580.98 per note (58.098% of the principal amount at maturity). The company may redeem for cash all or a portion of the notes at any time on or after May 16, 2011 at a price equal to the sum of the issue price and the accrued original issue discount. Holders of the notes will have the right to require the company to repurchase some or all of the notes at specified prices on May 16 of each of 2011,

2014, 2019, 2024 and 2029 and upon certain events constituting a fundamental change.

The company has granted the initial purchaser a 30-day option to purchase up to $18,749,968 gross proceeds of additional notes.

Thoratec intends to use approximately $8.9 million of the net proceeds to acquire U.S. government securities that will be pledged as collateral for the payment of the first six scheduled interest payments on the notes ($10.2 million if the initial purchaser's option is exercised in full). In addition, Thoratec has purchased approximately $60 million, or 4,184,100 shares, of its common stock in connection with the offering. Thoratec intends to use the balance of the net proceeds from the offering for general corporate purposes, which may include additional stock repurchases, strategic investments or acquisitions. Pending such uses, Thoratec intends to invest the net proceeds in interest bearing, marketable securities.

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of these securities and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation or sale is unlawful.

31. On June 8, 2004, the Company issued a press release entitled "Thoratec Corporation Announces Exercise of Option to Purchase Additional Senior Subordinated Convertible Notes." The press release stated in part:

Thoratec Corporation today announced that the initial purchaser for its offering of senior subordinated convertible notes due 2034 has exercised its option to purchase additional notes generating approximately $18.7 million of gross proceeds to the company. On May 24, 2004, Thoratec closed its initial offering of approximately $125 million gross proceeds of senior subordinated convertible notes. Accordingly, as of today, the company has generated total gross proceeds of approximately $143.7 million from the sale of the senior subordinated convertible notes. The senior subordinated convertible notes have been and are being offered and sold only to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended.

Thoratec intends to use approximately $1.3 million of the additional net proceeds to acquire U.S. government securities that will be pledged as collateral for the payment of the first six scheduled interest payments on the additional notes ($10.2 million in total for the full amount of notes). In addition, Thoratec previously purchased approximately $60 million, or 4,184,100 shares, of its common stock in connection with the initial offering. Thoratec intends to use the balance of the net proceeds from the offering for general corporate purposes, which may include stock repurchases, strategic investments or acquisitions. Pending such uses, Thoratec intends to invest the net proceeds in interest bearing, marketable securities.

32. Then, on June 29, 2004, the Company reduced earnings estimates in a press release entitled "Thoratec Comments on Second Quarter Destination Therapy Activity and Financial Results and Outlook." The press release stated in part:

> Thoratec Corporation, a world leader in products to treat cardiovascular disease, today provided an update on its business activities and outlook for the balance of 2004.
>
> The company said that 30-35 Destination Therapy implants will occur in the second quarter of 2004 ending July 3, bringing the total number of Destination Therapy implants to date in 2004 to approximately 75.
>
> Thoratec said that it expects revenues for the second quarter of 2004 will be approximately $40-$41 million, and that taxed cash earnings per share for the second quarter will be approximately $0.02. Taxed cash earnings exclude the effect of merger, restructuring and other costs and amortization of purchased intangible assets. On a GAAP basis, the company expects a net loss in the second quarter of $0.01 per share. The company will report complete results for the second quarter in late July.
>
> "The patient experience with Destination Therapy and response from leading centers and clinicians continue to be very positive and we are very encouraged by the recent proposal from CMS that would significantly increase reimbursement for Destination Therapy by another 30 percent, effective October 1 of this year," said D. Keith Grossman, president and chief executive officer of Thoratec. "We now expect, however, that certain of our centers may delay some of their Destination Therapy."

33. As a result of this news, on June 30, 2004, the price of Thoratec stock dropped precipitously to $10.74 from a close of $14.42 the prior day, a drop of more than 25%, on extraordinarily heavy volume of over 11 million shares.

34. The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) Even as the Company estimated that as many as 100,000 patients per year in the U.S. could be helped by their new Destination Therapy treatment option, the actual "true" market for the product was far less than claimed as it was severely constrained by limited reimbursement dollars available under Medicare and Medicaid service guidelines.

(b) Although the defendants claimed that there were approximately 900 hospital centers in the U.S. qualified for the practice of Destination Therapy and implantation of the HeartMate, in fact less than 75 centers have been designated as Medicare-approved for Destination Therapy.

(c) While the Company pointed to its "sample letter of medical necessity," along with instructions on how to "educate the payer" on costs associated with the treatment option posted on its Web site, defendants already knew that Medicare had rigid preset reimbursement guidelines

and schedules for Destination Therapy, which could only translate into a serious negative impact on the Company's FY 2004 sales projections for the HeartMate.

(d) Cardiothorasic surgeons were rejecting and/or not accepting the HeartMate as a viable device for Destination Therapy patients because of issues with the device's reliability in a long-term setting;

(e) The demand for the Company's Destination Therapy implants was not growing at the rate claimed.

(f) The Company's Destination Therapy implant estimate for FY2004 of between 300 to 500 pumps was grossly overstated and was internally projected to be a fraction of this estimate.

(g) The Company's FY2004 projections of $190-$200 million were overstated by tens of millions of dollars.

(h) Not only were CMS reimbursement charges delaying the number of implants, the Company was aware that implantation centers and medical professionals would delay any significant expansion of the existing implant programs until after October 1, 2004 – the expected date of the availability of a significant increase in the CMS reimbursement rate.

(i) Sales of the HeartMate implants would be depressed until Q4 2004 and as a result, the Company's earnings shortfall experienced in Q1 2004 (versus Q4 2003 and Q1 2003) would not be made up for nearly one year, until Q1 2005, at best.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

35. Plaintiff incorporates ¶¶1-34 by reference.

36. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

37. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Thoratec publicly traded securities during the Class Period.

38. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Thoratec publicly traded securities. Plaintiff and the Class would not have purchased Thoratec publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

39. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Thoratec publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act Against All Defendants

40. Plaintiff incorporates ¶¶1-39 by reference.

41. The Individual Defendants acted as controlling persons of Thoratec within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Thoratec, and their ownership of Thoratec stock, the Individual Defendants had the power and authority to cause Thoratec to engage in the wrongful conduct complained of herein. Thoratec controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Thoratec are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

42. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Thoratec publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

43. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Thoratec had more than 55 million shares of stock outstanding, owned by hundreds if not thousands of persons.

44. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of Thoratec's publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

45. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

46. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, interest and costs; and

C. Awarding reasonable costs, including attorney and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 3, 2004

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN

PATRICK J. COUGHLIN

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
PAUL J. GELLER
JONATHAN M. STEIN
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Thoratec.doc

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

ATTORNEY OF RECORD FOR
PLAINTIFF JERRELL JOHNSON

S:\CptDraft\Securities\cpt thoratec.doc

LERACH COUGHLIN STOIA & ROBBINS, LLP
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, JERRELL JOHNSON ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1. Plaintiff has reviewed the Thoratec Corp. complaint and authorized its filing.

2. Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| Thoratec Corp. - THOR | Purchased | 400 | 5/19/04 | 14.61 per share |
| CALL-TQUGC | Purchased | 20 contracts Jucd 5R | 4/29/04 | .85 per share |
| | | | | |
| THOR | SALE | 400 | 7/8/04 | 10.55 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please list additional transactions on a separate sheet if necessary.**

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10 day of July, 2004.

[signature]
SIGNATURE

Please fill out the additional information. Thank you.

Name (print): Jerrell Johnson

Address: 1060 Terragano Drive

Tracy, California 95376

County of Residence: SAN JOAQUIN

Daytime Phone No.: 209-835-1713

Evening Phone No.: –

Email address: JJHNSN31@comcast.net

O:\cgbr\Thoratec Corp (S)\corres\J.Johnson cert re\ltr.70804.wpd