1

2

3                                                           **E-FILED on** _____5/11/06__

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                             SAN JOSE DIVISION

11

12  | In re THORATEC CORP. SECURITIES | No. C-04-03168  RMW |
    | LITIGATION | |
13  | | ORDER GRANTING MOTION TO DISMISS |
    | | CONSOLIDATED COMPLAINT |
14  | _____ | |
15  | This Document Relates to: | **[Re: Docket No. 31]** |
16  | ALL ACTIONS | |

17

18

19        Defendants Thoratec Corporation ("Thoratec"), D. Keith Grossman ("Grossman"), M.

20  Wayne Boylston ("Boylston"), and Jeffrey Nelson ("Nelson") (collectively "defendants") move to

21  dismiss lead plaintiff Toby Craig's Consolidated Complaint ("Compl.").  Plaintiff opposes the

22  motion.  The motion was heard on June 17, 2005.  The court has read the moving and responding

23  papers and heard the argument of counsel.  For the reasons set forth below, the court grants

24  defendants' motion to dismiss plaintiff's first and second claims for relief with leave to amend.

25

26

27

28

# I. BACKGROUND[1]

This action, filed August 3, 2004, is brought on behalf of a proposed class of persons who purchased the publicly-traded securities of Thoratec between April 28, 2004 and June 29, 2004 ("class period").  Plaintiff's complaint alleges violations of section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, by all defendants, and alleges violations of § 20(a) of the Exchange Act by individual defendants Grossman, Boylston, and Nelson.  Plaintiff alleges that Thoratec securities were traded at artificially-inflated prices during the class period as a result of defendants' alleged actions, misrepresentations, and omissions, specifically that defendants (1) made false and misleading statements regarding expected sales and market prospects of a key Thoratec product, the HeartMate XVE; and (2) concealed adverse material facts about the HeartMate XVE.

Thoratec is a leading supplier of implantable and external circulatory support products, known as "ventricular assist devices" ("VADs"), for treating patients with congestive heart failure.  Compl. ¶ 2.  Some patients with congestive heart failure qualify for heart transplantation.  As an interim measure while awaiting transplant, these patients may receive a left ventricular assist device ("LVAD") as a "bridge to transplant."  *Id.*  Other patients cannot qualify for heart transplantation because of a variety of factors such as unavailability of a transplant heart or medical unsuitability.  Thoratec produced an LVAD, the HeartMate XVE, for use in "Destination Therapy."  Destination Therapy ("DT") is designed for patients with end-stage congestive heart failure who are ineligible for heart transplantation.  It involves the permanent implantation of an LVAD.  Thoratec's Heartmate XVE is currently the only device approved for DT by the Food and Drug Administration ("FDA").

A clinical trial conducted from May 1998 through June 2001 included, among other treatments for congestive heart failure, a Thoratec HeartMate LVAD device.  *Id.* at 23.  The Randomized Evaluation of Mechanical Assistance for the Treatment of Congestive Heart Failure

---

[1]        The court summarizes the facts from the complaint, assuming them to be true for the purpose of this motion. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002) ("On a motion to dismiss, the reviewing court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff.").

1   ("REMATCH") trial included Thoratec's HeartMate SNAP-VE.  Defs. Request for Judicial Notice

2   ("RJN"), Ex. C (Eric A. Rose *et al*, *Long-Term Use of a Left Ventricular Assist Device for End-*

3   *Stage Heart Failure*, 345 NEW ENG. J. MED. 1435, 1436 (Nov. 15, 2001)).  Plaintiffs allege that the

4   trial revealed serious problems with the use of the HeartMate LVAD device for DT, including

5   device failure and high infection and mortality rates.  Compl. ¶¶ 33-35.

6       The FDA granted "pre-market approval" for Thoratec's HeartMate SNAP-VE for DT on

7   November 6, 2002.  *Id.*, Ex. A at 4.  In April 2003, the FDA granted supplemental approval to the

8   HeartMate XVE for DT.  In October 2003, the Centers for Medicare & Medicaid Services ("CMS"),

9   which administers the Medicare program and assists the administration of Medicaid, approved a

10  limited reimbursement for LVAD therapy.  Compl. ¶ 25.  The CMS reimbursement guidelines

11  required, *inter alia*, that implantation be done at an approved transplant facility that had performed

12  at least 15 LVAD implantations between January 1, 2001 and September 30, 2003.  *Id.*  There was

13  also a list of medical requirements for eligibility for reimbursement including that the patient was

14  ineligible for a heart transplant, had failed to respond to medical management, and had limited

15  function with peak oxygen consumption.  *Id.*

16      In April 2004, Blue Cross and Blue Shield Association issued a report entitled "Special

17  Report: Cost-Effectiveness of Left-Ventricular Assist Devices as Destination Therapy for End-Stage

18  Heart Failure."  The report concluded that "[t]he baseline cost-effectiveness analysis . . . showed that

19  the use of LVADs leads to an increase in cost of $802,700 to gain 1 [Quality of Life Year] compared

20  with optimal medical management."  Compl., Ex. A at 26.  Thereafter, starting on April 20, 2004,

21  Thoratec's stock began trading under $12 per share.  Compl. ¶ 6.

22      Grossman is Thoratec's President, CEO, and a member of the Board of Directors.  *Id.* ¶ 13.

23  Boylston was a Senior Vice President and Thoratec's CFO.[2]  *Id.* ¶ 14.  On April 27, 2004, Thoratec

24  issued a press release reporting first-quarter 2004 ("Q1 2004") results.  That same day, Grossman

25  and Boylston, along with Nelson, the President of Thoratec's Cardiovascular Division, conducted an

26  earnings release conference call.  *Id.* ¶ 42.  Grossman and Boylston announced Thoratec's product

27

28  _____

    [2]      Boylston resigned from Thoratec in December 2004 and is currently a consultant at
    Thoratec.

1   sales, taxed cash earnings, and net income for Q1 2004.  They elaborated that sales of heart assist

2   devices benefitted from Q1 2004 being the first full quarter in which Thoratec had both DT approval

3   and the coverage by Medicare announced in October 2003, stating that 42 HeartMate devices were

4   implanted in Q1 2004, a number roughly equal to the number of DT implants for all of 2003.  *Id.* ¶

5   42.

6        Grossman reiterated guidance for 2004 that had been provided in two prior calls.  Thoratec

7   projected revenues of between $190 and $200 million (an increase of 27 to 33 percent over 2003).  It

8   projected that 300 to 500 DT units would be implanted in FY 2004 and that revenue guidance was

9   based on achieving the midpoint of that projection of 400 DT units.  *Id.*  Grossman also stated that

10  he expected gross margin to stay in the "59-60 percent kind of range for the next few quarters."  *Id.*

11       In addition, Nelson discussed Thoratec's DT sales market program extensively.  *Id.*  He

12  discussed Thoratec's Heart Hope program, a collaborative effort between Thoratec and "leading

13  heart centers committed to advancing clinical, educational, and economic outcomes of Destination

14  Therapy" that was "just beginning to have an impact in the marketplace."  Compl. Ex. E.  Of the 67

15  CMS-approved DT therapy centers, approximately 20 were participants in Thoratec's Heart Hope

16  program.  Compl. ¶ 45(c).

17       Following the April 2004 conference call, Thoratec's stock price rose 10% in one day, from

18  below $12 on April 27, 2004 to $13.20 per share on April 28, 2004.  Compl. ¶ 43.  On May 13,

19  2004, Thoratec included these revenue projections in its Form 10-Q filing for Q2 2004.  *Id.* ¶ 49, Ex.

20  H.

21       On May 11, 2004, Thoratec issued a press release stating that CMS had issued a proposed

22  rule that would change the diagnosis-related group under which reimbursements were assessed,

23  potentially resulting in increased reimbursement of 30% for VADs, from $96,000 to $125,000.

24  RJN, Ex. B.  Thoratec reportedly characterized this proposed rule "as a boon for patients opting for

25  its HeartMate XVE LVAS device."  Compl. ¶ 47, Ex. G (Andrew Wallmeyer, *Thoratec Comments*

26  *On CMS Proposal Regarding VAD Reimbursement*, Dow Jones Newswires, May 11, 2004).

27  Following this announcement, Thoratec's stock closed at $14.99 per share, a 15.4% increase over the

28  May 10, 2004 close.  *Id.* ¶ 47.

1     On May 17, 2004, four days after submitting its Form 10-Q filing, Thoratec announced a

2  private placement of $125 million in senior subordinated convertible notes.  Compl. ¶¶ 51-53.  It

3  announced it had sold a total of $143.7 million in notes on June 8, 2004 and used $60 million of the

4  proceeds to repurchase shares of its common stock.  *Id.* ¶ 54.  Three weeks later, on June 29, 2004,

5  defendants announced that Thoratec would not sell 400 DT units in 2004 and cut its sales projection

6  to 200 units.  *Id.* ¶ 57, 59, 60, Exs. M-O.  On June 30, 2004, Thoratec stock lost over 25% of its

7  value, or $3.68 per share, dropping from a per-share price of $14.42 to $10.74.  *Id.* ¶ 62.

8     The first of these consolidated cases was filed August 3, 2004.

9     On December 2, 2004, Thoratec announced that, based on the first two months of Q4 2004,

10  its DT implants were "roughly equivalent to that of each of the first three quarters of the year,"

11  ranging between 34 to 42 per quarter.  *Id.* ¶ 63, Ex. P.  Boylston resigned on December 17, 2004.  *Id.*

12  ¶ 65.  On January 10, 2005, Thoratec reported that it has failed to meet its revised projection.  It

13  announced that it had sold 171 devices in FY 2004, missing its restated estimate by 29 units, or 15%.

14  *Id.* ¶ 66.

## II.  ANALYSIS

### A.    Documents Properly Before the Court

17     When considering a motion to dismiss, the court is generally confined to consideration of the

18  allegations in the pleadings.  Fed. R. Civ. P. 12(b)(6).  However, when the complaint is accompanied

19  by attached documents, such documents are deemed part of the complaint and may be considered in

20  evaluating the merits of a Rule 12(b)(6) motion.  *Durning v. First Boston Corp.*, 815 F.2d 1265,

21  1267 (9th Cir.), *cert. denied sub. nom. Wyo. Cmty. Dev. Auth. v. Durning*, 484 U.S. 944 (1987).  The

22  court may also consider documents incorporated by reference, *Kramer v. Time Warner, Inc.*, 937

23  F.2d 767, 773 (2d Cir. 1991); *see also Townsend v. Columbia Operations*, 667 F.2d 844, 848 (9th

24  Cir. 1982), and documents "whose contents are alleged in the complaint and whose authenticity no

25  party questions," *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *cert. denied*, 114 S.Ct.

26  2704 (1994); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).

27     Defendants request judicial notice of five documents: (1) Thoratec's Form 10-K Report for

28  fiscal year ended January 3, 2004; (2) a press release issued by Thoratec on May 11, 2004, (3) a

November 2001 article from the *New England Journal of Medicine* entitled "Long-Term Use of a Left Ventricular Assist Device for End Stage Heart Failure" publishing the results of the REMATCH trial; (4) the market price of Thoratec's common stock during November 2001; and (5) premarket approval orders for the HeartMate LVAS issued by the FDA on various dates.  Plaintiffs do not dispute that judicial notice is proper with respect to the Form 10-K Report or the press release, however, they contend that the remaining items are not properly subject to judicial notice. Defendants, on the other hand, argue that the court may "examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent, including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiffs' allegations necessarily rely."  *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 883 (W.D.N.C. 2001).

The court finds it appropriate to take judicial notice of the *New England Journal of Medicine* article regarding the REMATCH trial results to the extent that defendants rely upon it for the date it was published.  The court takes judicial notice of the publication date, but, as set forth below, the court does not consider defendant's "truth on the market" defense at the present stage of litigation. The court may also rely on the article to the extent that plaintiff's allegations rely upon the REMATCH trial results.  The complaint refers extensively to the REMATCH trial results but plaintiff attaches only articles and other documents referencing the trial results.  Thus, the court may take judicial notice of the *New England Journal* article contents in order to establish the sufficiency of the allegations.  *See Parrino v. FHP*, Inc., 146 F.3d 699, 706 (9th Cir. 1998); *see also Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1110 (N.D. Cal. 2003) ("Where a plaintiff fails to attach to the complaint documents referred to in it, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support plaintiff's claim.").

Plaintiff's complaint does not necessarily rely upon either Thoratec's stock price around the announcement of the REMATCH trial results or the FDA premarket approval orders.  Defendants assert that the stock prices around the REMATCH results are subject to judicial notice in support of

1    a "truth on the market" defense.  However, "a 'truth-on-the-market' defense is available in principle .

2    . . but not at the pleading stage."  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).  Thus,

3    the stock values in 2001 are not critical at this stage of the litigation.  Likewise, plaintiff does not

4    contest that the Thoratec devices have received FDA approval.[3]  Defendants seek to use the contents

5    of these FDA documents to establish that the HeartMate XVE incorporated improvements

6    addressing concerns raised by the REMATCH trial data and that this information was reflected in

7    the stock price.  This would constitute an impermissible use of a judicially noticed fact.

8    Accordingly, the court declines to take judicial notice of the FDA premarket approval orders.

9         **B.     Pleading Standards**

10        "In an effort to deter abusive and frivolous securities fraud claims, Congress enacted the

11   PSLRA, which amended the 1934 Act and raised the pleading standards for private securities fraud

12   claims."  *No. 84 Employer-Teamster v. America West Holding* ("*America West*"), 320 F.3d 920, 931

13   (9th Cir. 2003) (citing *In re Silicon Graphics Inc. Sec. Litig.* ("*Silicon Graphics*"), 183 F.3d 970, 973

14   (9th Cir. 1999)).   The Private Securities Litigation Reform Act ("PSLRA") requires that a complaint

15   plead with particularity both falsity and scienter.  *America West*, 320 F.3d at 931.  If a plaintiff fails

16   to plead either the alleged misleading statements or scienter with particularity, his or her complaint

17   must be dismissed.  *See America West*, 320 F.3d at 931-32; 15 U.S.C. § 78u-4(b)(3)(A).

18        First, where plaintiff alleges that the defendant either (1) made an untrue statement of

19   material fact or (2) omitted to state a material fact necessary to make statements made not

20   misleading, the PSLRA requires

21            the complaint shall specify each statement alleged to have been
             misleading, the reason or reasons why the statement is misleading,
22            and, if an allegation regarding the statement or omission is made on
             information and belief, the complaint shall state with particularity all
23            facts on which that belief is formed.

24   15 U.S.C. § 78u-4(b)(1); *America West*, 320 F.3d at 931.  Second, with regard to pleading scienter,

25

26        [3]      The Court may take judicial notice of the FDA preapproval notices as a matter of
     public record.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) (noting that court may take
27   judicial notice of public records on a Rule 12(b)(6) motion); *Lamers Dairy Inc. v. USDA*, 379 F.3d
     466, 471 n.8 (7th Cir. 2004) ("This court may take judicial notice of reports of administrative
28   bodies."); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 745 n. 2 (E.D. Pa. 2003)
     (taking judicial notice of FDA report posted on the official FDA website).

1    the PSLRA provides the complaint shall "state with particularity facts giving rise to a strong

2    inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

3         In the Ninth Circuit, these dual pleading requirements of sections 78u-4(b)(1) and (b)(2) are

4    incorporated into a single inquiry, "because falsity and scienter are generally inferred from the same

5    set of facts." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003).  Thus, to determine whether

6    a private securities fraud complaint survives a motion to dismiss under Federal Rule of Civil

7    Procedure 12(b)(6), the court must ascertain whether particular facts in the complaint, taken as a

8    whole, raise a strong inference that defendants intentionally or with deliberate recklessness made

9    false or misleading statements to investors. *Id.* at 846; *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th

10   Cir. 2001).  Where pleadings "taken as a whole, [] do not raise a 'strong inference' that misleading

11   statements were knowingly or [with] deliberate recklessness made to investors, a private securities

12   fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi*, 253 F.3d at 429; *see also*

13   *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002).

14        **C.    Safe Harbor**

15        Defendants contend that a majority of false or misleading statements alleged by plaintiff are

16   forward-looking statements subject to the PSLRA's safe harbor provision.  A forward-looking

17   statement is defined as a statement containing a projection of revenues, income, or earnings per

18   share, management's plans or objectives for future operations, or a prediction of future economic

19   performance. 15 U.S.C. § 78u-5(*i*)(1)(A)-(C).  Under the safe harbor provision of the PSLRA, a

20   company may not be liable for forward-looking statements if they are identified as such and

21   accompanied by specific, meaningful cautions. 15 U.S.C. § 78u-5(c).  For safe harbor protection

22   under the PSLRA to apply, the forward-looking statements must either be: (1) accompanied by

23   "meaningful cautionary statements identifying important factors that could cause actual results to

24   differ materially;" or (2) must not be made with actual knowledge of falsity. *See* 15 U.S.C. §

25   78u-5(c)(1)(A); 15 U.S.C. § 78u-4(b)(1)-(2).

26        The safe harbor requires that the cautionary language mention "important factors that could

27   cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §

28   77z-2(c)(1)(A)(i).  Plaintiff contends that defendants' forward-looking statements were not

1   accompanied by the requisite cautionary language.[4]  Defendants, on the other hand, demonstrate

2   based on plaintiff's pleadings that Thoratec's March 17, 2004 Form 10-K referenced at the beginning

3   of the conference call and other relevant document warned of precisely the risks plaintiff complains

4   of: (a) that third-party payors would "fail to provide appropriate levels of reimbursement" (RJN, Ex.

5   A at 19); (b) that the market was constrained by the number of hospitals approved by CMS for DT,

6   patient and physician acceptance of DT, and actual clinical results (*id.* at 20); (c) that relative cost

7   and efficacy of alternative therapies might limit the use of DT (*id.*); and (d) that other "economic,

8   psychological, ethical and other concerns" may limit acceptance of ventricular assist products (*id.* at

9   21).  The court agrees that these stated risks track the contents of the forward-looking statements of

10  which plaintiff complains.

11          Relying on *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727 (7th Cir. 2004), plaintiff argues that the

12  issue of whether defendants' cautionary statements were adequate is a question of fact that cannot be

13  decided on a motion to dismiss.  However, the Ninth Circuit has stated otherwise:  "The bespeaks

14  caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a

15  motion to dismiss for failure to state a cause of action or a motion for summary judgment) that

16  defendants' forward-looking representations contained enough cautionary language or risk

17  disclosure to protect the defendant against claims of securities fraud."  *In re Worlds of Wonder Sec.*

18  *Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994).  The PSLRA safe harbor is a statutory form of the

19  bespeaks caution doctrine.  *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v.*

20  *Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).  Thus, courts may rule as a matter of law, where

21  appropriate, that cautionary language was sufficient under the first prong of the safe harbor

22  provision.

23          The court in *Baxter* recognized that the "PSLRA does not require the most helpful caution"

24  so long as the caution is enough to identify "important factors that could cause actual results to differ

25

26          [4]     The PSLRA does not require that the cautions physically accompany oral statements.
    If other requirements are met, an oral statement may specify that "additional information concerning

27  factors that could cause actual results to materially differ from those in the forward-looking
    statement is contained in a readily available written document."  15 U.S.C. § 78u-5(c)(2)(B)(i);

28  *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133
    (9th Cir. 2004).  Plaintiff does not dispute that the caution may be in a written document, rather he
    questions the sufficiency of those cautions.

1    materially from those in the forward-looking statement."  377 F.3d at 733.  "The statute calls for

2    issuers to reveal the 'important factors' but not to attach probabilities to each potential bad outcome,

3    or to reveal in detail what could go wrong . . ."  *Id.; see also In re Copper Mountain Sec. Litig.*, 311

4    F. Supp. 2d 857, 822 (N.D. Cal. 2004).  As here, where the important factors identified in

5    conjunction with the forward-looking statement are precisely those that the plaintiff contends caused

6    the actual results to differ materially, it is difficult to see how the cautionary language could be

7    inadequate.  Thus, the inquiry must then move to the second test: whether defendants had actual

8    knowledge of the falsity of their forward-looking statements.  15 U.S.C. § 78u-4(b)(1)-(2).

9         **D.     False or Misleading Statements**

10        For purposes of their motion to dismiss, defendants grouped the alleged false or misleading

11   statements into two categories: statements of present or historical fact and forward-looking

12   statements.

13                      **1.     Statements of Present or Historical Fact**

14        Defendants argue that a majority of the purportedly false or misleading statements alleged by

15   plaintiff were forward-looking statements subject to safe harbor protection under the PSLRA.

16   However, as to the statements of present or historical fact alleged to be false or misleading,

17   defendants contend that plaintiff failed to allege facts to support his allegations.  Specifically,

18   defendants challenge the following statements from the April 27, 2004 press release and conference

19   call: (1) "[w]e feel we are off to a good start," (2) "[o]ur results for the quarter reflect solid growth,"

20   (3) "[w]e are very pleased with the response to Heart Hope to date," (4) "[t]he response from

21   attendees, who are thought leaders, was very positive and they came away with even a higher level

22   of enthusiasm for the [DT] opportunity", (5) "there is a tremendous amount of enthusiasm in our

23   organization and the marketplace right now", and (6) "we are more certain than ever that [DT] is

24   going to be a very significant market."  Compl. ¶¶ 41, 42.  Defendants also challenge plaintiff's

25   allegations regarding the falsity of the following statement from a June 29, 2004 Knobias press

26   report: "We remain very encouraged by the level of interest and activity of our customers and

27   continue to be optimistic that Destination Therapy activity will accelerate later in the year, and

28   especially in 2005."  *Id.* ¶ 60, Ex. O.

1    Plaintiff does not appear to address defendants' challenge to the adequacy of his pleadings

2    regarding the falsity of these statements of present or historical fact.

3                    **2.    Forward-looking statements**

4    Defendants also argue that the following forward-looking statements were subject to the

5    PSLRA safe harbor provisions: (1) Thoratec's sales projections, (2) its 2004 revenue projections,

6    (3) general statements of optimism concerning its DT devices, (4) its predicted gross margins, (5)

7    the future costs of DT, (6) factors driving future growth in DT, (7) assumptions underlying the sales

8    and financial projections, and (8) predicted CMS reimbursement rate.  Plaintiff does not dispute that

9    these are forward-looking statements as defined by the PSLRA.  15 U.S.C. § 78u-5(i)(1).  Plaintiff

10   does, however, argue that the statements are not entitled to safe harbor protection, contending, first,

11   that the statements were not accompanied by meaningful cautionary statements and, second, that the

12   statements were made with actual knowledge of their falsity.  As set forth above, the court finds that

13   the cautionary statements provided are sufficient as a matter of law with respect to the forward-

14   looking statements pleaded.

15   Regarding actual knowledge of falsity, first, the court notes that plaintiff did not address

16   defendants' arguments that its prediction about competition for the HeartMate XVE was false or

17   misleading when made.  As support for his contention that defendants' positive statements about the

18   potential market for the HeartMate XVS were knowingly false, plaintiff alleges that Thoratec faces

19   "substantial competition" from World Heart Corporation's Novacor Left-Ventrical Assist System

20   ("Novacor LVAS").  In particular, plaintiff notes the commencement of a clinical trial directly

21   comparing the HeartMate XVE to the Novacor LVAS, the RELIANT trial.  However, the complaint

22   also notes that the RELIANT population trial began in February 2004 and does not otherwise plead

23   that defendants had access to the trial results at the time the allegedly false statements were made in

24   April 2004.  Compl. ¶ 37.

25   As a result it would appear, as defendants contend, that plaintiff only sought in his papers to

26   support the falsity of the following statements: (1) Thoratec's April 27, 2004 affirmation of its

27   November 2003 projection of 300-500 implants in 2004; (2) the June 29, 2004 restated projection of

28   200 implants in 2004; and (3) Thoratec's revenue projections of $190-$200 million based on meeting

1   the midpoint of the implant projection.  Thus, as all allegedly false or misleading statements derive

2   from the alleged falsity of defendants' projections regarding the number of DT implantations for

3   2004, the court restricts its analysis of falsity and scienter to this issue.

4              **a.        Market Size Projection**

5              As evidence that defendants had actual knowledge that their implant projection of 300-500

6   was false, plaintiff claims that Thoratec falsely "estimated that as many as 100,000 patients per year

7   in the United States could be helped by their new DT treatment option" while knowing that the real

8   number was closer to 200.  Compl. ¶ 39(a).  Defendants argue, and the court agrees, that plaintiff's

9   allegation is itself misrepresentative of what Thoratec actually stated.  Thoratec stated "we estimate

10  the market penetration for this indication could be between 5,000 and 15,000 patients annually using

11  current approved to technology and up to 100,000 patients annually in the United States alone as we

12  introduce new technologies that increase the life of our VAD and improve the life of our VAD and

13  improve the outcome of procedures."  RJN, Ex. A.  This statement does not indicate that Thoratec

14  misrepresented that the HeartMate XVE could be implanted into 100,000 patients annually.[5]

15             Plaintiff's contention that by 2004 certain experts had estimated market size for LVAD

16  implants at 200 over two years likewise does not allege with particularity that defendants had actual

17  knowledge that their market size projection of 5,000 to 15,000 patients was false.  Aside from a

18  WebMD article published in August 2004, after both the April 27, 2004 projection and June 29,

19  2004 revised projection, plaintiff fails to identify any experts who held such an opinion or that

20  defendants had knowledge of such opinions, if any existed.

21             **b.        Prohibitive Cost**s

22             Defendants contend that none of plaintiff's allegations regarding the costs of LVAD

23  implantation is true and, even if true, none would suggest that defendants had actual knowledge their

24  projections were false.  The defendants argue that, even assuming that they did not reveal that the

25

26             [5]        One of the articles attached to the complaint supports defendants' estimate that 5,000
    to 15,000 patients would be viable candidates for LVAD DT devices.  *See* Compl., Ex. C (Mehmet
27  C. Oz *et al*, *Left Ventricular Assist Devices as Permanent Heart Failure Therapy: The Price of
    Progress*, 238 ANNALS SURG. 577, 582 (October 2003) (stating that "of the estimated 60,000
28  patients who could benefit from cardiac transplantation each year, we conjecture approximately 20%
    [*i.e.*, 12,000 patients] would be candidates for long-term LVAD therapy at present")).

costs of DT exceeded the even the projected increased reimbursement benefit, plaintiff has failed to plead facts that show the cost of LVAD DT implantation limited the number of implants to be performed. Defendants contend that plaintiff has failed to allege that the cost of DT implantation in 2004 was equal to or greater than the cost of implantation during the REMATCH trial and, accordingly, that plaintiff's allegations related to the costs of DT based on the REMATCH trial have no bearing on the costs of the HeartMate XVE. This argument is unavailing, as the inference favoring plaintiff, that the implantation cost remained the same or increased between the REMATCH trial and the announcement, is a reasonable one. However, plaintiff lists among the costs of LVAD implantation additional expenses such as hospitalization costs associated with the 88 median days of hospitalization known to be required after LVAD implantation. Compl. ¶ 44(c). Even assuming the hospitalization costs of LVAD implantation exceed the projected reimbursement benefit for implantation of the LVAD device, plaintiff has not alleged facts showing that the additional costs would result, as he conclusorily claims, that "cardiac transplant and CHF centers did not promote DT due to the fact that they would generally lose money." *Id.* Thus, as pleaded, the amount of reimbursement benefit as compared with the total cost of LVAD DT does not support a strong inference that defendants' statements were made with scienter.

<b>c.     Implantation Rate</b>

Plaintiff contends that the rate of implantation in 2004 at the date of the April 27, 2004 press release clearly demonstrates that Thoratec's projection of 300-500 implants for fiscal year 2004 was unachievable. Defendants disclosed that there had been 42 DT implantations of the HeartMate XVE in Q1 2004. In the following quarter, only 34 placements of the HeartMate XVE were made.

The April 27, 2004 announcement was made one month, or one-third of the way, into Q2 2004. Plaintiff contends that, even assuming all Q1 and Q2 implants had been made by the time of the April 27 announcement, Thoratec's midpoint projection of 400 units could not have been met. Plaintiff asserts that a projection of 400 units requires a steady sales rate throughout the year, thus, Thoratec would have had to sell 100 units per quarter to meet its projection. Since it only sold 42 units the first quarter, Thoratec would have had to sell approximately 119 devices each remaining quarter to meet its 400 implant projection by the end of the year.

1    Defendants, on the other hand, assert that nothing in their projection indicated that the sales

2    projection would be equally balanced throughout the remaining quarters of 2004. Instead, they

3    contend that, given (1) the increase in the number of implants from FY 2003 to Q1 2004 placements,

4    and (2) Thoratec's repeated assertion that sales would be back-ended into the later quarters of 2004,

5    it is reasonable to infer that defendants projections were based on ramping sales throughout the year.

6    Based on such an assumption, a 400-unit placement projection would have been achievable: Q1 =

7    42; Q2 = 80; Q3 = 120; Q4 = 160. Therefore, anticipation of such increasing numbers may have

8    seemed justified at the time, given that the 42 units implanted in Q1 2004 equaled the sales in all of

9    2003.

10    In a motion to dismiss under the PSLRA, "when determining whether plaintiffs have shown a

11    strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the

12    allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d

13    893, 897 (9th Cir. 2002); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380

14    F.3d 1226, 1230 (9th Cir. 2004). When weighing the competing inferences set forth above, the court

15    finds that the inference that defendants had a good-faith basis for their projection based upon

16    anticipated late-year sales at least as plausible as plaintiff's conclusion that defendants acted with

17    scienter. Without more, plaintiff has failed to show a strong inference that either the April 27, 2004

18    projection or the June 29, 2004 restated projection was either false or made with actual knowledge

19    that the projected number of implants was unachievable when made.[6]

20                    **d.    Opinions of the Medical Community**

21    Plaintiff contends that "[i]nvestigation and consultation with doctors in the medical field

22    regarding DT and investigations of transplant centers . . . revealed that by at least 2004, the

23    HeartMate LVAD device would not have the market share defendants claim." While seeming to

24    plead with particularity that defendants were aware of the existence of information between April

25

26          [6]    Plaintiff also argues that Thoratec's sales cycle as acknowledged in their 10-K Form
          was nine to eighteen months and that, as a result, Thoratec would have known by April 27, 2004 that
27        its implantation projections were false. Defendants point out that the period set forth in the 10-K
          Form is nine to eighteen months from "initial contact with the cardiac surgeon until purchase" (RJN,
28        Ex. A at 12) and that this number does not reflect the number of DT implants that would be
          performed by existing DT centers familiar with the HeartMate device.

1    27, 2004 and June 29, 2004—when the statements regarding the potential market share for LVADs

2    for DT were made—closer inspection reveals that plaintiff has failed to plead that the information

3    was available to defendants.  While plaintiff lists the transplant centers participating in the

4    "consultation and investigation," he does not provide any details as to where the adverse information

5    may have been compiled or how defendants may have had access to it.

6         Furthermore, plaintiff alleges that cardiologists and patients were shying away from DT due

7    to medical problems associated with DT complications and the costliness of the DT option.  While

8    plaintiff presents allegations that there were problems with the device and that it was an expensive

9    option, particularly as compared with medical management, he identifies no medical opinions or

10   reports that demonstrate that these factors were causing either physicians or patients to forego the

11   option.[7]

12                    **e.       Truth on the Market**

13        Defendants argue that their truth-on-the-market defense demonstrates that they did not have

14   actual knowledge of falsity regarding their forward-looking statements, requiring the court to

15   dismiss plaintiff's complaint.  As set forth above, courts generally may not dismiss a complaint on

16   the basis of a truth-on-the-market defense to a fraud-on-the-market theory.  *Cf. Ganino v. Citizens*

17   *Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely

18   fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead

19   materiality.");  *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) ("Before the

20   'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that

21   was withheld or misrepresented was 'transmitted to the public with a degree of intensity and

22   credibility sufficient to effectively counterbalance any misleading impression created by insider's

23   one-sided representations.'") (citing *Kaplan v. Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994)).  Thus, the

24

25

26        [7]      While defendants attempt to demonstrate in their motion to dismiss that the medical
problems present in the devices used in the REMATCH trial had been resolved in the HeartMate
27   XVE, this attempt presents a factual question that the court must resolve in plaintiff's favor.  The
inferences that could be drawn from the evidence defendants present (such as the FDA premarket
28   approval sheets showing approval of an improvement to the inflow valve of the HeartMate device)
do not suffice to overcome the inference that the problems with use of LVADs in DT persisted.

1    court finds defendants' arguments that the information was already available to the public to be an

2    inappropriate basis for finding an insufficient pleading of scienter and falsity.

3        **C.    Additional Scienter Allegations**

4        As set forth above, the PSLRA provides that the complaint shall "state with particularity

5    facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

6    U.S.C. § 78u-4(b)(2).  In the Ninth Circuit, plaintiffs must allege facts sufficient to create an

7    inference of "deliberate or conscious recklessness." *America West*, 320 F.3d at 931.[8]  "In order to

8    show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to

9    demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics*, 183 F.3d

10   at 974.  Here, plaintiff additionally seeks to satisfy the scienter pleading requirement by alleging that

11   defendants were motivated to make misleading or fraudulent statements to keep the Thoratec's stock

12   price high for Thoratec's May 2004 private placement offering in order to recoup substantial cash

13   losses from marketing DT.

14       Plaintiff contends that defendants intended to fraudulently inflate Thoratec's stock price.

15   Less than a week after Thoratec filed its 10-Q Form for Q1 2004 containing the allegedly false

16   material, it announced it was making a $125 million note offering.  Defendants had spent $4 million

17   to launch DT programs in Q1 2004, but had only made $1.3 million in the same period.  Plaintiff

18   contends that Thoratec's need to raise capital to cover this shortfall demonstrates a strong motivation

19   to keep Thoratec's stock price high.  The higher the stock price, the more attractive the offered notes

20   would be to investors.

21       The court concludes that plaintiff has failed to allege sufficient particularized facts to support

22   a strong inference that defendants intended to commit fraud with respect to the private placement

23   offering.  Plaintiff's complaint quotes the announcement as stating that Thoratec intended to use the

24   proceeds of the private placement offering to repurchase its stock.  Inflating the price of the stock

25   only to repurchase it at the inflated price does not give rise to a strong inference that defendants had

26

27   _____

28       [8]    Or, as set forth above in the safe harbor discussion, where the challenged act
     constitutes a forward-looking statement, "actual knowledge . . . that the statement was false or
     misleading." *Id.*

1   a strong motive to fraudulently prop up Thoratec's stock price.[9]  Plaintiff alleges that defendants

2   were motivated to commit fraud to preserve their salaries and keep their jobs.  However, he alleges

3   no facts to support a strong inference that defendants' jobs were in jeopardy as a result of the $4

4   million expenditure in light of the $1.3 million income.  Nor does he explain why $143 million

5   would have been required to cover a $2.7 million net expenditure on marketing DT.  Absent a

6   particular motive, "a generalized motive, one which could be imputed to any publicly-owned,

7   for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Kalnit v. Eichler*,

8   264 F.3d 131, 140 (2d Cir. 2001).

9         Finally, the court considers whether the totality of plaintiff's scienter allegations, even though

10   individually lacking, are sufficient to create a strong inference that defendants acted with deliberate

11   or conscious recklessness, if not actual knowledge.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

12   1038 (9th Cir. 2002).  Here, absent pleadings sufficiently particular to demonstrate actual knowledge

13   of falsity, the allegations of motive are simply too generalized to create a strong inference that

14   defendants acted knowingly or with deliberate recklessness.

15         **D.       Controlling Person Liability**

16         Section 20(a) provides joint and several liability for controlling persons who aid and abet

17   securities violations.  15 U.S.C. § 78t(a).  To prove a prima facie case under section 20(a), a plaintiff

18   must prove: "(1) 'a primary violation of the federal securities law' and (2) 'that the defendant

19   exercised actual power or control over the primary violator.'" *America West*, 320 F.3d at 945

20   (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)).

21         "To be liable under section 20(a), the defendants must be liable under another section of the

22   Exchange Act." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

23   Defendants contend plaintiff's section 20(a) claims must be dismissed because plaintiff's complaint

24   fails to satisfy the pleading requirements for the asserted section 10(b) and 10b-5 violations—

25   without a primary violation of federal securities law, plaintiff would be unable to make out a prima

26

27

28         [9]      As plaintiff argues, neither does a stock repurchase necessarily negate scienter.  *See America West*, 320 F.3d at 928-38 (holding that plaintiffs had sufficiently pled scienter after considering a stock repurchase among the factors).

ORDER GRANTING MOTION TO DISMISS CONSOLIDATED COMPLAINT—C-04-03168 RMW
MAG                                                        17

1  facie case under section 20(a).  As set forth above, plaintiff has failed to plead primary securities law

2  violations by defendants.  Therefore, plaintiff's section 20(a) claim must be dismissed.

3        **E.     Leave to Amend**

4        Leave to amend is to be freely granted when justice so requires.  *See* Fed. R. Civ. P. 15(a).

5  "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the

6  complaint could not be saved by amendment."  *Eminence Capital v. Aspeon Inc.*, 316 F.3d 1048,

7  1053 (9th Cir. 2003) (error to refuse leave to amend in a securities fraud case to allow plaintiff to

8  plead scienter).

9        It is possible that plaintiff could remedy the pleading defects in an amended complaint by

10  demonstrating that defendants the requisite scienter at the time the statements were made.  *Lopez v.*

11  *Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (leave to amend should be granted unless the district

12  court "determines that the pleading could not possibly be cured by the allegation of other facts").

13  Accordingly, the court grants dismissal without prejudice in order to allow plaintiff the opportunity

14  to attempt to remedy the pleading defects if he so chooses.

15                                          **III.  ORDER**

16        For the foregoing reasons, the court finds the complaint fails to adequately allege the falsity

17  of the challenged statements and defendants' scienter with the requisite particularity.  Therefore, the

18  court grants without prejudice defendants' motion to dismiss the complaint for failure to state a

19  claim.   Plaintiffs shall have 30 days from the date of this order  to file an amended complaint.

20

21

22  DATED:              5/10/06

23                                  RONALD M. WHYTE
                                  United States District Judge

24

25

26

27

28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Patrick J. Coughlin | patc@mwbhl.com |
| Darren J. Robbins | DRobbins@lerachlaw.com |
| Jonathan M. Stein | |
| Paul J. Geller | |
| William B. Federman | wfederman@aol.com |
| William S. Lerach | billl@lerachlaw.com |
| Mel E. Lifshitz | lifshitz@bernlieb.com |
| Peter A. Binkow | pbinkow@glancylaw.com |
| Marc A. Topaz | |
| Richard A. Maniskas | |
| Robert S. Green | RSG@CLASSCOUNSEL.COM |
| Tamara Skvirsky | |
| Lionel Z. Glancy | info@glancylaw.com |
| Michael M. Goldberg | info@glancylaw.com |
| Bing Ryan | bingr@lerachlaw.com |
| Jack G. Fruchter | |
| Jeffrey W. Lawrence | jeffreyl@lerachlaw.com |
| Connie Cheung | conniec@lerachlaw.com |

**Counsel for Defendants:**

| | |
|---|---|
| Michael B. Smith | mbsmith@gibsondunn.com |
| Paul J. Collins | pcollins@gibsondunn.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

Dated: _____ 5/11/2006 _____         _____

                                              Chambers of Judge Whyte